[Cite as *State ex rel. Doran v. Preble Cty. Bd. of Commrs.*, 2013-Ohio-3579.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

PREBLE COUNTY

| | | |
|---|---|---|
| STATE EX REL. KELLY DORAN, Taxpayer, et al., | : | |
| | : | CASE NO. CA2012-11-015 |
| Plaintiffs-Appellants, | : | |
| - vs - | : | O P I N I O N<br>8/19/2013 |
| | : | |
| PREBLE COUNTY BOARD OF COMMISSIONERS, et al., | : | |
| Defendants-Appellees. | : | |

CIVIL APPEAL FROM PREBLE COUNTY COURT OF COMMON PLEAS
Case No. 12CV29351

Frost Brown Todd LLC, Stephen N. Haughey, Thaddeus H. Driscoll, 3300 Great American Tower, 301 East 4th Street, Cincinnati, Ohio 45202 and Frost Brown Todd LLC, Benjamin J. Helwig, 9277 Centre Pointe Drive, Suite 300, West Chester, Ohio 45069, for plaintiffs-appellants, Kelly Doran and Village of Camden, Ohio

Martin P. Votel, Preble County Prosecuting Attorney, Eric E. Marit, Preble County Courthouse, 101 East Main Street, Eaton, Ohio 45320, for defendant-appellee, Preble County Board of Commissioners

Augustus L. Ross III, 1614 U.S. 35 East, Eaton, Ohio 45320, for defendant-appellee, Lakengren Water Authority

Garbig & Schmidt, LLC, Phillip R. Garbig, Caroline R. Schmidt, 2840 Alt. St. Rt. #49, Arcanum, Ohio 45304, for defendant-appellee, Brumbaugh Construction

**RINGLAND, P.J.**

{¶ 1} Plaintiffs-appellants, Preble County taxpayer Kelly Doran and the village of

Camden (the "Village"),[1] appeal a decision of the Preble County Common Pleas Court awarding judgment to defendants-appellants, the Preble County Board of Commissioners (the "Board"), Lakengren Water Authority ("Lakengren"), and Brumbaugh Construction Company ("Brumbaugh") after a trial on the issues of Ohio's competitive bidding and ethics statutes.[2] For the reasons set forth below, we affirm the decision of the trial court.

{¶ 2} In early 2008, the Board began exploring options for disposing of leachate generated at the county's landfill (the "leachate project").[3] Thus, the Board entered into negotiations with the Village to discuss the option of transporting leachate through a force main sewer line from the landfill to the Village's collection system. In a "cooperative agreement" entered into by the Board and the Village in October 2008, the parties agreed to share in the funding of the leachate project with the Board assuming responsibility for 70 percent of the funding and the Village responsible for 30 percent. However, in March 2009, the Board terminated discussions with the Village regarding the leachate project and subsequently published a Request for Proposals ("RFPs") that invited interested entities to bid for the award of a 20-year contract to dispose of the leachate (the "leachate contract"). The RFPs indicated that interested offerors could obtain a "project description" from the Board, which consisted of a written project description, a written scope of work, and a written list factors and criteria to be used in the evaluation of the submitted proposals.

{¶ 3} In order to review the submitted proposals, the Board appointed an RFP selection committee. The responsibility of the committee was to evaluate and score

1. The village of Camden is a municipality located in Preble County, Ohio.

2. Lakengren and Brumbaugh were named as indispensable parties in the action under Civ.R. 19 and Ohio's declaratory judgment statute because they were parties to the contracts being challenged. Neither Lakengren nor Brumbaugh actively participated in the trial other than to support the position taken by the Board.

3. Leachate consists of the soluble constituents derived from waste as it decomposes and enters into water by percolating through a landfill.

proposals, then submit recommendations to the Board regarding an award of the leachate contract. The RFP selection committee, comprised of five total members, included County Engineer Steve Simmons and Chief Deputy County Engineer Kyle Cross. Both Simmons and Cross were residents of Lakengren, a private residential community whose residents formed their own sewer utility for sewer collection and treatment.

{¶ 4} Both the Village and Lakengren submitted proposals to the Board that were reviewed by the selection committee in October 2009. After the proposals had been submitted and opened for review, the selection committee prepared a detailed scoring sheet and scored the proposals before concluding that Lakengren's proposal scored higher than the Village's. Thus, the selection committee voted to recommend to the Board that Lakengren be awarded the leachate contract. The Board adopted the recommendation and entered into a contract with Lakengren on January 25, 2010.

{¶ 5} In December 2010, 11 months after the award of the contract to Lakengren, the Village filed a federal lawsuit in the United States District Court for the Southern District of Ohio. The suit alleged a Section 1983 federal civil rights claim arising from the Board's award of the leachate contract to Lakengren. The suit also sought supplemental federal jurisdiction over state law claims including alleged violations of Ohio's competitive bidding statutes under R.C. 307.86, et seq. However, the lawsuit was dismissed in April 2011 for lack of federal jurisdiction.

{¶ 6} Following dismissal of the federal suit, the Board requested public bids for a contract to construct a pressure force main sewer line and appurtenances from Preble County's landfill to Lakengren. In November 2011, Brumbaugh was awarded the contract to construct the sewer line and construction of the line began in January 2012.

{¶ 7} On March 19, 2012, approximately 27 months after the leachate contract had been awarded to Lakengren, the Village, along with taxpayer Kelly Doran (collectively,

"appellants"), filed suit in the Preble County Common Pleas Court against the Board, Lakengren, and Brumbaugh. The complaint alleged violations of Ohio's competitive bidding statutes (R.C. 307.86 and R.C. 307.862), Ohio's conflict of interest and public ethics statutes (R.C. 305.27 and R.C. 102.03), and Ohio's taxpayer statutes (R.C. 309.12 and R.C. 209.13), as well as a claim that the Village was entitled to a writ of mandamus pursuant to R.C. 2731.02, asserting a clear legal right to the award of the leachate contract to the Village.

{¶ 8} By the time the present suit was initiated, 79 percent of the force main sewer line construction had been completed and $240,125 had already been spent by Preble County on the sewer line alone, as distinguished from the construction of the pumping and retention facilities. In addition, $871,167.85 of the $1,490,670.50 contract had been submitted to Preble County by Brumbaugh for payment.

{¶ 9} A trial was held May 7, 2012, at which point the force main had been completed, pressure-tested, and was ready for service, $333,799 had been spent by Preble County on the force main portion of the project, and the contract with Brumbaugh was within one month of completion. Testimony at trial revealed that awarding the contract to the Village at this time would cost Preble County taxpayers, at minimum, an additional $381,355 in the construction of a new sewer line to the Village. On October 30, 2012, based upon these facts, the trial court issued a decision granting the Board's motion to dismiss appellants' claims under Ohio's competitive bidding statutes and ruling that appellants' remaining claims were barred by the equitable doctrine of laches.

{¶ 10} From the trial court's decision, appellants appeal, raising two assignments of error. Appellants do not appeal the trial court's dismissal of their claims under Ohio's competitive bidding statutes but appeal those claims barred by the doctrine of laches.

{¶ 11} Assignment of Error No. 1:

{¶ 12} THE TRIAL COURT ERRED BY HOLDING THAT THE EQUITABLE

- 4 -

DOCTRINE OF LACHES BARRED PLAINTIFFS-APPELLANTS' CLAIMS.

{¶ 13} In their first assignment of error, appellants raise several issues: (1) laches does not apply to a taxpayer suit under R.C. 309.12 or R.C. 309.13; (2) laches does not apply to the claims of a local government against another local government for violation of the public's rights; (3) laches does not apply when the party asserting the defense has unclean hands; and (4) even if laches applied, the Board failed to introduce evidence to support a finding of laches. In essence, appellants contend the trial court improperly found that their claims were barred by the doctrine of laches.

{¶ 14} "'Laches is an omission to assert a right for an unreasonable and unexplained length of time, under circumstances prejudicial to the adverse party. It signifies delay independent of limitations in statutes.'" *Merchants Bank & Trust Co. v. Kelly*, 12th Dist. Butler No. CA2003-09-229, 2004-Ohio-3913, ¶ 20, quoting *Connin v. Bailey*, 15 Ohio St.3d 34, 35 (1984); *Smith v. Smith*, 107 Ohio App. 440, 443-444 (8th Dist.1957). In order to successfully invoke the equitable doctrine of laches, "it must be shown that the person for whose benefit the doctrine will operate has been materially prejudiced by the delay of the person asserting his claim." *Id.*, citing *Connin* at 35-36; *Smith v. Smith*, 168 Ohio St. 447 (1959), paragraph three of the syllabus.

## Taxpayer Claims

{¶ 15} Appellants first argue that Doran's claims under R.C. 309.12 and R.C. 309.13 cannot be barred by the doctrine of laches. Specifically, appellants contend that, because taxpayer suits serve a vital interest to guard against improper public expenditures, Ohio courts have consistently held that taxpayer suits cannot be barred by laches. The issue is whether Ohio law permits the equitable application of the doctrine of laches to claims regarding the rights of taxpayers. As this is a question of law, we review appellants' contention under a de novo standard of review. *Wilson v. AC&S, Inc.*, 169 Ohio App.3d 720,

2006-Ohio-6704, ¶ 61 (12th Dist.) ("Questions of law are reviewed de novo, independently, and without deference to the trial court's decision"); *Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227, 231 (6th Cir.2007) ("[W]hen a reviewing court is presented with a threshold question of law as to whether the laches doctrine is even applicable in a particular situation, as we are here, our review is *de novo*").

{¶ 16} A taxpayer suit is a unique type of "derivative action, created by statute, that is brought on behalf of the municipality to ensure that its officers comply with the law, do not misapply funds, or do not abuse the municipality's corporate powers." *Cincinnati ex rel. Ritter v. Cincinnati Reds, L.L.C.*, 150 Ohio App.3d 728, 2002-Ohio-7078, ¶ 20 (1st Dist.), citing *Columbus ex rel. Willits v. Cremean*, 27 Ohio App.2d 137, 149 (10th Dist.1971).

{¶ 17} There is extremely limited case law on the application of laches to a taxpayer lawsuit and the majority of these cases date back to 1980 or earlier. Nevertheless, in reviewing the cases relied upon by appellants, we find there is no outright "maxim" declaring that the doctrine of laches cannot be applied to bar the suit of an Ohio taxpayer. *See State ex rel. Scobie v. Cass,* 22 Ohio C.D. 208, 213, 32 Ohio C.C. 208, 1910 WL 639 (Oct. 28, 1910) (holding that laches did not apply due to the plaintiff's reasonable diligence and finding that the court "would hardly be warranted, in a suit begun on behalf of the taxpayers of the county, to protect their interests against the illegal expenditure of public funds, in finding that the plaintiff was guilty of laches, *unless such clearly appeared to be the case*"); *Pincelli v. The Ohio Bridge Corp.*, 5 Ohio St.2d 41 (1966) (addressing injunctive relief under R.C. 309.13 rather than laches); *Yoder v. Williams Cty.*, 48 Ohio App.2d 36, 42 (6th Dist.1976) (finding the doctrine of laches inapplicable *in this case* "where the plaintiff used reasonable diligence in prosecuting the action"); *State of Ohio ex rel. Crown Controls Corp. v. Reinhart*, 3d Dist. Auglaize No. 2-78-6, 1978 WL 215789, *4 (July 25, 1978) (finding that the doctrine of laches may apply in certain cases but is inapplicable *in the case at hand*, where the action

was "not personal but on behalf of the public, is barred by no specific statute of limitations and involves a void contract, not simply voidable"); *Takacs v. City of Euclid, Ohio*, 8th Dist. Cuyahoga Nos. 40978 & 41113, 1980 WL 354795, *5 (Aug. 14, 1980) (holding that laches did not apply due to the plaintiff's reasonable diligence and quoting *Scobie* for the proposition that application of the doctrine of laches is not applicable in a suit brought by a taxpayer to protect the public "*unless such clearly appeared to be the case*").

{¶ 18} Thus, Ohio case law does not prohibit the application of laches as a defense to a taxpayer suit under R.C. 309.12 and R.C. 309.13. Rather, the application of the doctrine of laches in a taxpayer suit brought to protect the public's interest is permissible where it "clearly appear[s] to be the case." *Scobie* at 213; *Takacs* at *5. As such, we find that the doctrine of laches may be used as a defense in a taxpayer lawsuit where it is shown "that the person for whose benefit the doctrine will operate has been materially prejudiced by the delay of the person asserting his claim." *Kelly*, 2004-Ohio-3913 at ¶ 20.

## Local Government v. Local Government

{¶ 19} Appellants next argue that the doctrine of laches cannot be applied to claims of a local government (the Village) against another local government (Preble County) for violations of public rights. Specifically, appellants contend the trial court erred as a matter of law in applying the doctrine of laches to the case at hand, as "courts across Ohio have continued to apply the deeply-rooted maxim that laches does not apply to state and local governments when they bring claims to protect the public's rights." We review appellants' argument that application of the doctrine of laches is impermissible to all lawsuits involving local government de novo. *Wilson*, 2006-Ohio-6704 at ¶ 61; *Chirco*, 474 F.3d at 231.

{¶ 20} Appellants are correct that "laches is *generally* no defense to a suit by the government to enforce a public right or to protect a public interest." (Emphasis added.) *Ohio State Bd. of Pharmacy v. Frantz*, 51 Ohio St.3d 143 (1990), paragraph three of the

syllabus; *Ohio Dept. of Transp. v. Sullivan*, 38 Ohio St.3d 137, 139 (1988); *Portage Cty. Bd. of Commrs. v. Akron*, 109 Ohio St.3d 106, 2006-Ohio-954, ¶ 82. "The rationale behind this rule is one of public policy; the public should not suffer due to the inaction of public officials." *Still v. Hayman*, 153 Ohio App.3d 487, 2003-Ohio-4113, ¶ 11 (7th Dist.); *Frantz* at 146, citing *Lee v. Sturges*, 46 Ohio St. 153, 176 (1889). "To impute laches to the government would be to erroneously impede it in the exercise of its duty to enforce the law and protect the public interest." *Frantz* at 146.

{¶ 21} Despite this general principle, "the imposition of an absolute bar to the availability of laches as a legal defense against the state has never been held by the Ohio Supreme Court." *Still* at ¶ 8, citing *Adams Cty. Child Support Enforcement Agency v. Osborne*, 4th Dist. Adams No. 95CA592, 1996 WL 230038 (May 3, 1996). The "true reason [behind this general rule] is to be found in the great public policy of preserving the public rights, revenues, and property from injury and loss, by the negligence of public officers." *Sullivan* at 138.

{¶ 22} A case between two public bodies does not present the same concerns of protecting the public interest as does a case between a public body and a private citizen or private entity. Therefore, we find the doctrine of laches may be imputed upon a unit of government serving one public constituency which is suing another unit of government serving a different public constituency, as both parties have a duty to enforce the law and preserve the public rights, revenues, and property from injury and loss. While "estoppel and laches rarely lie against government bodies" due to the "principle that public rights generally should not yield to those of private parties," there is "little or no such concern in this dispute *between* public bodies." *State ex rel. City of Monett v. Lawrence Cty.*, Mo.App. No. SD31500, 2013 WL 1952537, *4 (May 13, 2013); *see also Munn v. Horvitz Co.*, 175 Ohio St. 521, 529 (1964). Accordingly, laches may be applied in cases involving disputes between

public bodies.

## Unclean Hands

{¶ 23} Appellants additionally argue the doctrine of laches cannot apply specifically to this case because the Board does not have clean hands. Appellants argue the Board cannot assert laches because it failed to act in good faith when it executed a cooperative agreement with the Village, used the agreement to obtain a loan from the Ohio Public Works Commission ("OPWC"), and then ignored the agreement and awarded the leachate contract to Lakengren. Additionally, appellants argue the Board has unclean hands because it allowed Simmons and Cross, both residents of Lakengren, to organize and sit on the RFP selection committee and recommend to the Board that Lakengren be given the leachate contract.

{¶ 24} "The most memorable equitable maxim learned by every first year law student is 'he who comes seeking equity must come with clean hands.'" *City of Kettering v. Berger*, 4 Ohio App.3d 254, 261 (2d Dist.1982). "In order to have any standing to successfully assert an equitable defense, *i.e.,* laches, one must come with clean hands, and if he has violated conscience or good faith or has acted fraudulently, equitable release in defenses are not available to him." *Id.* at 261-262. "[U]nclean hands are not to be lightly inferred. They must be established by clear, unequivocal and convincing evidence." *Hoover Transp. Services, Inc. v. Frye*, 77 Fed.Appx. 776, 784 (6th Cir.2003), quoting *Kearney & Trecker Corp. v. Cincinnati Milacron, Inc.,* 562 F.2d 365, 371 (6th Cir.1977). Appellants' allegations of unclean hands are supported by little, if any, evidence.

{¶ 25} Testimony at trial revealed that Simmons, on behalf of the Board, began exclusive negotiations with the Village regarding the leachate project in 2008. Based, in part, upon these negotiations, Simmons prepared an OPWC loan application listing the Village as the destination of the force main sewer line where the leachate would be treated. As part of

the loan application, Simmons included the October 2008 "cooperative agreement" entered into by the Village and the Board. Doran admits that the cooperative agreement was not a contract and Simmons explained that attaching the cooperative agreement to the loan application was "kind of moot," as the OPWC "couldn't spend [loan money] fast enough" and had not turned down a loan in the last 20 years. OPWC eventually approved the loan including the Village as the end location of the force main sewer line. Simmons explained, however, that negotiations between the Village and the Board ultimately broke down over the issue of cost and, therefore, the Board sought bids elsewhere. After Lakengren secured the leachate project contract, the Board amended the OPWC application to list Lakengren as the destination of the force main.

{¶ 26} Furthermore, Simmons and Doran testified regarding the Board's earnest desire to partner with the Village regarding the leachate project. Though Simmons is a resident of Lakengren, Doran testified about Simmons's repeated statements that the Board "always" had an intent to use the Village for the leachate project and that the Board showed "goodwill" and "interest" in entering into a leachate contract with the Village.

{¶ 27} The Village has failed to present evidence that the Board's negotiations with the Village and appointment of the selection committee were done in bad faith, without good conscience, or were fraudulent in nature. No contract was agreed to by the Board and the Village and, thus, no breach of contract has occurred. Furthermore, negotiations break down between parties regularly and, without more, we do not find that the Board's eventual decision to request bids from other entities was an indication of unclean hands. Finally, even had Simmons or Cross sought to influence the selection committee to side in favor of Lakengren, the Board made the final decision as to who would be awarded the leachate contract. The selection committee's responsibility was simply to recommend an offeror to the Board and it was the Board who made the determination to offer the contract to Lakengren,

not Simmons or Cross. Based upon our review of the record, we find that the trial court did not err in applying the doctrine of laches to the case at hand, as there is no evidence that the Board acted with unclean hands.

## Sufficient Evidence

{¶ 28} Finally, appellants contend that, even if the doctrine of laches is applicable to taxpayer and local government actions, the doctrine should not be applied in this case, as the Board failed to present sufficient evidence for a finding of laches.

{¶ 29} The party invoking the doctrine of laches "must establish, by a preponderance of the evidence, the following four elements: (1) unreasonable delay or lapse of time in asserting a right; (2) absence of an excuse for the delay; (3) knowledge, actual or constructive, of the injury or wrong; and (4) prejudice to the other party." *Dyrdek v. Dyrdek*, 4th Dist. Washington No. 09CA29, 2010-Ohio-2329, ¶18, citing *State ex rel. Meyers v. Columbus*, 71 Ohio St.3d 603, 605 (1995); *Pavkov v. Time Warner Cable*, 9th Dist. Wayne No. 99CA0025, 2000 WL 354163, *4-5 (Apr. 5, 2000).

{¶ 30} "What constitutes material prejudice is primarily a question of fact to be resolved through a consideration of the special circumstances of each case." *Shockey v. Blackburn*, 12th Dist. Warren No. CA98-07-085, 1999 WL 326174, *4 (May 17, 1999), citing *Bitonte v. Tiffin Savings Bank*, 65 Ohio App.3d 734, 739 (3d Dist.1989). "An appellate court will not reverse the decision of a trial court regarding the application of the doctrine of laches unless there is a showing of an abuse of discretion." *Id.*, citing *Payne v. Cartee*, 111 Ohio App.3d 580, 590 (4th Dist.1996); *see also State ex rel. Choices for South–Western City Schools v. Anthony*, 108 Ohio St.3d 1, 2005-Ohio-5362, ¶ 27. An abuse of discretion is more than an error of law or judgment; it involves a determination that the trial court's decision is arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 31} We find the case at hand analogous to the Eighth Appellate District's case of *Ormond v. City of Solon*, 8th Dist. Cuyahoga No. 79223, 2001 WL 1243959 (Oct. 18, 2001). In *Ormond*, the Eighth District addressed the dispute between a resident property owner and the city of Solon concerning the development of a residential subdivision within the city limits. *Id.* at *1. The resident asserted that the city, in contravention of the city charter, changed the zoning classification of the land which was to be used for the subdivision. *Id.* The resident, therefore, sought a preliminary injunction enjoining the construction of the subdivision. *Id.* The trial court found that the resident "waited too long after the * * * construction on the project had started to seek a temporary restraining order and/or preliminary injunction to enjoin the construction efforts." *Id.* at *2.

{¶ 32} On appeal, the Eighth District found that the doctrine of laches applied to bar the resident's claims. *Id.* The court determined that "ample documentation" demonstrated "the material prejudice which would have inured to the detriment of the city and the developers had the trial court granted the [resident's] untimely request for injunctive relief." Specifically, the Eighth District quoted the finding of the trial court:

> Notwithstanding the fact that [the resident] had notice that construction would start shortly after the January 18, 2000 approval of the preliminary plat, [the resident] did not move for a Temporary Restraining Order or Preliminary Injunction under June 28, 2000. * * * By that time, the construction of [the subdivision] had completed over seven major steps out of a total of ten steps in the development. * * * Thus, for almost seven months, [the resident] did not actively pursue an injunction until much of the construction had already been completed. To halt the construction now would certainly harm the developers more than [the resident] would be harmed without the injunction. Moreover, [the resident] should not be permitted to delay seeking an injunction thereby increasing the harm [the city] would suffer from such an injunction when the degree of harm would have been less severe had [the resident] actively sought an injunction sooner.

*Id.* at *3. With that, the Eighth District concurred with the trial court's application of the

doctrine of laches and conclusion that it would have been inequitable to have granted injunctive relief after the resident's delayed request for relief. *Id.*

{¶ 33} Just as in *Ormond*, ample evidence was presented before the trial court that appellants waited 27 months after the leachate contract was awarded to Lakengren before filing suit. Even if we discount, as appellants propose, the time between the leachate contract being awarded to Lakengren (January 2010) and when Brumbaugh was hired to build the sewer line (November 2011), appellants still waited an unreasonable four months before filing suit in state court. *See Jefferson Regional Water Auth. v. Montgomery Cty.*, 161 Ohio App.3d 310, 2005-Ohio-2755, ¶ 8 (2d Dist.) (plaintiff who waited seven months after knowing about a construction contract to file a claim was barred by the doctrine of laches). By the time appellants filed their March 19, 2012 complaint, 79 percent of the force main construction was complete and Preble County had already expended $240,125 to Brumbaugh. In addition, by the time of trial, $333,799 had already been spent by Preble County on the force main portion of the project alone, and the construction performed by Brumbaugh was within one month of completion. Finally, testimony at the trial revealed, and Doran confirmed, that Preble County's taxpayers would have been required to pay, at minimum, an additional $381,355 for the construction of a new sewer line to the Village had appellants' prevailed in the suit.

{¶ 34} Appellants assert the Board was put on notice of the potential lawsuit in October 2011 when appellants' trial counsel called Preble County's prosecutor, asking that the prosecutor discuss with the Board the leachate project, as Doran personally wished to avoid litigation if the Village was not awarded the leachate contract. However, beyond the testimony of Doran that his attorney said he made a telephone call to the prosecutor, there is no evidence in the record that such a conversation took place or that the Board was aware of any such communication. Rather, the testimony reveals, at best, that Doran's attorney

contacted the Preble County prosecutor's office regarding the leachate contract and was told "that ship has sailed." Without more, we cannot say that the Board had notice of the potential for suit in state court prior to the March 2012 filing of appellants' complaint.

{¶ 35} Appellants further claim that their reason for any delay in filing suit was due to the fact that the Village is a "small community" and too "poor" to file a lawsuit, as they did not "really budget for something like this." Appellants also allege that an Ohio EPA water supply emergency in the Village prevented the filing of the lawsuit in a more timely fashion. However, Doran testified that the water supply emergency which occurred in the Village did not affect funding for the lawsuit, as the emergency issue was funded by a low-interest loan which had no bearing on the Village's general fund. In addition, Doran testified that, although the water emergency occurred at the same time as the leachate project, the Village "never lost [their] focus" on the leachate project and that the project was "something that [the Village] always worked on, even in the midst of [the water emergency]." Finally, Doran testified that the Village has annual gross receipts of approximately $1,000,000 and was able to hire an attorney to represent the Board in federal court just one year prior to the state suit. Accordingly, we find that appellants failed to present a just reason for their delay in filing suit against the Board.

{¶ 36} Based upon our review of the record, we find evidence supporting the trial court's determination that there was an unreasonable delay between appellants' learning of the leachate contract and appellants' filing suit, there was no excuse for such a delay, and the Board, as well as the taxpayers of Preble County, were materially prejudiced by the delay. If appellants had filed suit sooner, prior to the commencement of construction or the award of a construction contract, their claims could have been addressed without harm to Preble County's taxpayers. We agree with the trial court that awarding the contract to the Village or requiring the Board to rebid the leachate project at this time would result in the

substantial waste of taxpayer funds in an already completed project. Appellants should not be permitted to delay filing their suit when such a delay causes a degree of harm that would have been less severe had appellants actively sought relief sooner. Consequently, we find that the trial court did not abuse its discretion in applying the doctrine of laches to the case at hand. It would have been inequitable to award judgment in favor of appellants after they delayed requesting relief for such an extended period of time.

{¶ 37} For the foregoing reasons, appellants' first assignment of error is overruled.

{¶ 38} Assignment of Error No. 2:

{¶ 39} THE TRIAL COURT ERRED BY HOLDING THAT OHIO'S ETHICS STATUTES WERE NOT VIOLATED WHEN COUNTY-APPOINTED COMMITTEE MEMBERS LIVING IN THE PRIVATE LAKENGREN COMMUNITY VOTED TO AWARD A 20-YEAR LEACHATE CONTRACT TO THE COMMUNITY.

{¶ 40} In their second assignment of error, appellants contend the Board violated R.C. 102.03 and R.C. 305.27 by including Lakengren residents as members of the leachate project selection committee. Specifically, appellants argue that Simmons and Cross had improper personal and pecuniary interests (1) when they developed scoring criteria for scoring the proposals after receiving Lakengren's proposal, (2) when they gave a higher score to Lakengren's proposal, and (3) when they voted to recommend to the Board that Lakengren receive the leachate project contract.

{¶ 41} Although the trial court addressed the merits of appellants' ethics claims relating to Simmons and Cross, the court ultimately dismissed these claims on the basis of laches, as discussed above. As our finding that laches applies in this case resolves the issue raised here, we decline to address appellants' second assignment of error. *See* App.R. 12(A)(1)(c); *Emerson Family Ltd. Partnership v. Emerson Tool, L.L.C.,* 9th Dist. Summit No. 26200, 2012-Ohio-5647, ¶ 23.

{¶ **42**} Judgment affirmed.

S. POWELL and PIPER, JJ., concur.